UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VICTORIA L. LANG,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 1:17-cv-503

Barrett, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Victoria Lang filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

Plaintiff previously filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") in April 2010, alleging disability beginning January 1, 2009 based upon carpal tunnel syndrome, obesity, a knee impairment, and a combination of mental impairments. After her 2010 applications were denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). In June 2012, ALJ Curt Marceille conducted a hearing by videoconference. On August 7, 2012, ALJ Marceille issued an adverse written decision, determining that Plaintiff could continue to perform a substantial number of jobs in the

1

national economy, and therefore was not disabled. (Tr. 74-92). The Appeals Council denied Plaintiff's request for review of that decision, and she did not further appeal.

Instead, in December 2013, Plaintiff filed new applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning on the day after ALJ Marceille's decision, based upon the same combination of impairments. After her claims were again denied initially and upon reconsideration, Plaintiff requested a new evidentiary hearing before an Administrative Law Judge. On March 22, 2016, Plaintiff appeared with a non-attorney representative and gave testimony before ALJ Paul Jones; a vocational expert also testified. On May 2, 2016, ALJ Jones issued a second adverse written decision, again concluding that Plaintiff is not disabled. (Tr. 12-29).

ALJ Jones determined that Plaintiff has severe impairments of osteoarthritis of the knees; carpal tunnel syndrome of the dominant right hand, obesity, depressive disorder/bipolar disorder/mood disorder with features of post-traumatic stress disorder, schizophrenia spectrum/psychotic disorder, and intermittent explosive disorder/personality disorder with antisocial and paranoid features. (Tr. 18). The ALJ additionally found that a host of additional physical impairments that Plaintiff alleged were disabling, including asthma, hypertension, cardiovascular complaints, sickle cell trait, various skin irritations, and inflammatory arthritis were all "not severe." (Tr. 18-20). The ALJ also found no intellectual disability had been established, notwithstanding Plaintiff's report of special education services when she was in grade school. (Tr. 19). The ALJ also determined that substance use disorder had not been established despite some evidence of possible dependence upon pain medication. (Tr. 19-20). Considering both severe and non-severe impairments that had been medically established, the ALJ found

2

that none of those impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 20). Instead, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a restricted range of sedentary work, subject to the following limitations:

> [T]here can be no climbing ladders, ropes, or scaffolds; no kneeling, crouching, or crawling; occasional stooping; frequent handling with the dominant right hand; simple, routine, repetitive tasks; no production quota work; occasional changes in the work setting; and occasional interaction with the public, coworkers, and supervisors.

(Tr. 23).

In determining Plaintiff's RFC, ALJ Jones indicated that he was "partially adopt[ing]" ALJ Marceille's earlier RFC findings under *Drummond v. Com'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). (Tr. 15, 23). Although he found no new or material evidence relating back to the prior adjudicated timeframe to justify disturbing the August 2012 decision, he considered new evidence that arose after that date, which was pertinent to the post-August 2012 disability period. (*Id.*) Nevertheless, considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a significant number of jobs in the national economy, including the representative jobs of inspector, sorter, assembler, and folder. (Tr. 29). The Appeals Council denied further review, leaving ALJ Jones's non-disability determination as the final decision of the Commissioner.

In her appeal to this Court, Plaintiff argues that the ALJ erred: (1) by finding that she could perform "frequent" handling with her right hand instead of limiting her to occasional use of her right hand; and (2) by finding only moderate mental limitations and declining to impose more severe mental limitations in assessing Plaintiff's mental RFC.

3

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Plaintiff's Claims**

**1. Right Hand Limitations**

In the August 2012 decision, ALJ Marceille found no severe impairment at all in Plaintiff's dominant right hand, based upon a normal x-ray with no indication of fracture, dislocation, calcification or pathologic change, and normal sensation during an October 2010 orthopedic examination for light touch and pinwheel pinprick testing. (Tr. 80). The ALJ also noted negative Tinel's signs over the median nerves at the carpal tunnels and the ulnar nerves at the wrists and elbows, and negative Phalen signs for carpal tunnel and Guyon's canal syndromes bilaterally. (*Id.*) Despite finding Plaintiff's carpal tunnel

5

syndrome to be non-severe, the ALJ limited Plaintiff based upon her overall complaints to "no forceful gripping with the right dominant hand." (*Id.*)

In the later 2016 decision that forms the basis for this judicial appeal, ALJ Jones deviated from the 2012 decision by finding Plaintiff's carpal tunnel syndrome in her right hand to be a "severe" impairment. (Tr. 20). However, Plaintiff argues that ALJ Jones still erred by finding that Plaintiff remained capable of performing "frequent handling" with her dominant right hand, rather than limiting her to only "occasional handling" with that hand. The vocational expert ("VE") testified that if Plaintiff were limited to occasional handling, there would be no jobs she could perform. (Tr. 71).

Plaintiff points to a number of medical records that she asserts support her claim of error, including a report of pain and swelling in her right hand on one occasion in April 2011 (Tr. 351), a complaint of numbness on one occasion in March 2012 (Tr. 363), and a diagnosis of osteoarthritis in September 2012. (Tr. 436). In January 2013, she complained of right arm (not hand) circulation issues. (Tr. 379). In March 2013, she was referred for surgical evaluation after complaining of wrist pain and a history of carpal tunnel syndrome. (Tr. 383). Upon examination, a clinician noted sensory deficits and decreased grip strength, greater in her right hand. (Tr. 833). In January 2014, EMG testing confirmed the presence of "mild" carpal tunnel syndrome in her right hand. (Tr. 24, 811-812). At an exam in February 2014, a physician documented continued swelling and tenderness, decreased sensation and decreased strength in the right hand and fingers. (Tr. 781). Based upon her complaints with some swelling and atrophic signs, Dr. Long "suspect[ed]" the possibility of complex regional pain syndrome ("CRPS") and referred her to a neurology in February 2014. (Tr. 783). In March 2014, she complained again of "R hand pain/ numbness." (Tr. 764).

6

I find no error, because substantial evidence supports the limitations as determined by the ALJ, and none of the evidence cited by Plaintiff requires any greater restriction. Despite the diagnosis of mild carpal tunnel syndrome, Plaintiff described being able to use her upper extremities effectively on her Adult Function Report, including being able to grip a cane and support her own body weight with her dominant right hand. (Tr. 20, citing Tr. 281). At the hearing, she also "described being able to take care of herself while her daughters were in school and working," and "said she could use her dominant right hand to write." (Tr. 20). The ALJ further noted that although Plaintiff came to the hearing wearing a black glove on her right hand and complaining of radiating pain up into her arm, x-rays were normal, and her diagnosis was only "mild" carpal tunnel syndrome based on EMG testing. (Tr. 24). Despite her complaints, she used her right hand to move boxes, dial a telephone, cook her own meals, and support substantial weight with a cane (320 pounds in March 2014, but down to 298 at the time of the second hearing). (Tr. 24-25, citing Tr. 1126, 1368, 1382).

Notably, Plaintiff fails to cite to any medical opinion that would support the more restrictive limitation that she seeks in this appeal. Instead, the medical opinion evidence supports the limitations as determined by the ALJ. (*See* Tr. 26, citing medical opinions). In March 2014, Dr. Cruz opined that Plaintiff could perform sedentary work except that she could not perform forceful gripping with her right hand. (Tr. 113). In June 2014, Dr. Hinzman declined to assess any additional limitations regarding Plaintiff's use of her right hand. (Tr. 157).

In her reply memorandum, Plaintiff focuses on a record that reflects an unspecified degree of "decreased sensation" and "decreased strength" during a single clinical exam, (Tr. 781), and a physician's hypothesis that she might have complex regional pain

7

syndrome ("CRPS") which "would further impede her ability to frequently use her dominant right hand…." (Doc. 17 at 1-2, citing Tr. 709). However, there is no evidence of any formal diagnosis of CRPS. All of the referenced evidence was considered by the ALJ. Finally, there is neither opinion evidence nor any other significant evidence that would require greater handling restrictions. A court will not reverse merely because substantial evidence exists to support a different conclusion, so long as substantial evidence supports the decision actually reached by the ALJ, as demonstrated by this case.

**2. The ALJ's Mental RFC Findings**

Plaintiff's second claim of error argues that the ALJ's determination that she had only moderate restrictions and non-disabling mental limitations is not substantially supported. For the reasons explained below, I find no reversible error.

**a. Moderate Not Marked Restrictions in Social Functioning at Step 3 and Corresponding Limitations at Steps 4 and 5**

At Step 3 of the sequential evaluation, the ALJ was required to consider the "Paragraph B" criteria in order to determine whether the Plaintiff's mental impairments met or medically equaled Listing Level severity. In order to satisfy the relevant criteria and prove Listing Level severity, a claimant must demonstrate at least two "marked" restrictions in the Paragraph B functional areas, or at least one marked restriction plus repeated episodes of decompensation, each of extended duration. In this case, the ALJ determined that Plaintiff did not meet or equal any Listing because she had only moderate and no marked restrictions in any of the functional areas, and no episodes of decompensation.

Plaintiff first argues that the ALJ erred by finding only moderate restriction in social functioning at Step 3. The ALJ found that "despite her subjective complaints, the evidence

8

shows the claimant can interact independently, appropriately, effectively, and on a sustained basis with other individuals." (Tr. 22). Plaintiff maintains that finding is not supported by Plaintiff's "self-reports as well as the medical evidence as a whole." (Doc. 12 at 9). However, Plaintiff points to no opinion evidence that she had marked restriction in social functioning at Step 3, nor does she offer any other evidence that would support that conclusion. In fact, although Plaintiff generally argues that the ALJ erred in finding only moderate restriction, she does not explicitly argue that she has marked restrictions in social functioning or in any other Paragraph B criteria sufficient to meet or equal any Listing. Having reviewed the record, the undersigned finds no error in the ALJ's determination that Plaintiff had only moderate and not marked restriction in social functioning under the Paragraph B criterion at Step 3.

Of course, the ALJ's determination that Plaintiff has only moderate restriction in the area of social functioning at Step 3 of the sequential analysis is not equivalent to a residual functional capacity assessment, which must be determined at Steps 4 and 5 of the analysis. (Tr. 23). Plaintiff also asserts error in the assessment of her mental RFC based upon her degree of social limitation. According to Plaintiff, the report of an examining consultant and her alleged hallucinations both support greater social limitations in the workplace setting; specifically, Plaintiff maintains that the ALJ should have limited her to "no contact" with coworkers rather than "occasional contact." Eliminating all contact would have been work-preclusive.

Plaintiff relies heavily upon the March 20, 2014 opinions of consultant Haley O'Connell, Pys.D. (Tr. 926-927). Plaintiff reported a long history of hallucinations to Dr. O'Connell. As a result of the clinical interview, Dr. O'Connell diagnosed "unspecified

9

schizophrenia spectrum and other psychotic disorder." (Tr. 925). However, under a section of the report titled "Reliability Estimate," Dr. O'Connell noted that Plaintiff

> reported some unusual and unlikely combinations of symptoms. She reported areas of intact functioning in addition to reporting impairment. She appeared to be a marginally reliable historian.

(Tr. 926). Plaintiff points to Dr. O'Connell's conclusion that Plaintiff's odd interpersonal style "would very likely interfere with her ability to relate appropriately with others and hold appropriate adult-level conversations in the workplace." (Tr. 926). However, Dr. O'Connell did not opine that Plaintiff was markedly restricted in social functioning at Step 3, and offered no specific work limitations that would support eliminating all contact with coworkers or any specific restrictions at all pertinent to Plaintiff's mental RFC at Steps 4 and 5. Dr. O'Connell's vague description that Plaintiff's symptoms would "likely interfere" with social interactions in a work setting does not preclude all interactions, or all work. With reference to Plaintiff's reported hallucinations, the ALJ found a severe impairment of "schizophrenia spectrum/ psychotic disorder" consistent with Dr. O'Connell's report but found that Plaintiff's primary diagnosis was bipolar disorder, and that despite her reports of seeing ghosts and believing in spirits, she was not hallucinating or psychotic. (Tr. 25 citing Tr. 1172, diagnostic assessment dated 2/28/13).

Contrary to Plaintiff's argument that the ALJ should have limited her to "no contact with co-workers," the undersigned finds substantial evidence to support the ALJ's decision to discount Plaintiff's subjective reports and to limit her to "occasional" interactions with the public, coworkers, and supervisors rather than prohibiting all social interactions. (Tr. 23.) Plaintiff focuses heavily on her historical reports of auditory and visual hallucinations, primarily involving hearing her name and seeing ghosts. (Doc. 12 at 10, citing therapy notes). While some notes contain evidence of that symptom, many

10

therapy notes include no references to hallucinations or reflect improvement. (*See, e.g.*, Tr. 709, reporting three employment interviews and that the voices had "quieted down" and were not occurring as frequently).

Contrary to Plaintiff's suggestion in this Court, her own records confirm that the mere existence of her reported hallucinations should not mandate a finding of disability. Plaintiff reported to Dr. O'Connell that she had experienced similar hallucinations on a daily basis since the age of seven or nine years old. (Tr. 922). Yet, despite this allegedly life-long history of hallucinations and difficulty getting along with coworkers and bosses and terminations for "attitude problems," Plaintiff successfully raised two daughters, lived with a boyfriend for three years, (Tr. 921), and had a work history that included semi-skilled and skilled work, including one job that she held for five years. (Tr. 922). Plaintiff has never been hospitalized for psychiatric symptoms and her mental health treatment has proven to be effective in reducing her symptoms. Thus, the record shows that Plaintiff's alleged hallucinations do not preclude her from all employment.

In addition, neither Dr. O'Connell nor any other source opined that Plaintiff should have no contact with coworkers. In support of her assertion that her mental RFC should have included this work-preclusive limitation, Plaintiff points to her testimony that she was kicked out of high school for fighting and had problems with co-workers and neighbors, with "virtually no social interactions other than with her daughters."[1] (Doc. 12 at 9-10). She also cites specific pages of therapy notes to support the "no contact" limitation she proposes.

---

[1] Plaintiff's records contain references to other social interactions with friends and close family members. She admits that March 2010 records reference a "best friend, Erica," with whom she reported enjoying going out to eat with their kids but suggests that the relationship had ended by November 2013. (Tr. 694).

11

Having reviewed the therapy notes cited by Plaintiff as well as additional notes and the record as a whole, I find no error. The ALJ explicitly acknowledged Plaintiff's history of anger problems, difficulty working with others, and anger issues that led to legal issues. (Tr. 19, 24-25). However, the ALJ cited significant other evidence that supported his assessment that Plaintiff retained some ability to interact with others. Apart from the questionable relevance of a historical report of Plaintiff being expelled for fighting in the 9th grade to her current disability claim, there were no school records or intelligence tests in the record. (Tr. 19). Although Plaintiff's work earnings were "low and sporadic," (Tr. 24), Plaintiff was able to raise two children as a single parent. (*Id.*) More importantly, the ALJ noted significant evidence in the record that supported his RFC assessment of "occasional" contact with coworkers rather than the complete elimination of any social interactions:

> [Plaintiff] interacts regularly with family members including her daughters, mother, aunt, etc. The claimant is not too anxious or angry to tolerate shopping at Sears, Walmart, and going swimming at the Y-Center. The claimant's social skills are adequate for her to be a caregiver to young children independently.

(Tr. 22, citing B3EE, B4F at 8, B9F:at 2, and B20F at 5).

Plaintiff argues that her visits to the Y-Center were part of recommended weight loss and physical therapy, not social outings. However, the ALJ never characterized them as social outings; he merely cited this evidence as one of many indications that Plaintiff was not so impaired or limited in her ability to interact with people that she could not tolerate any social interactions. The record supports this interpretation. Plaintiff told her therapist that she had been going to a Y attached to her daughter's college to work out, stating in the same session that she had been managing her anger well since their last session. (Tr. 1368).

Plaintiff also disputes the ALJ's references to her shopping, arguing that her anger issues caused her to be "kicked out of stores." However, the single therapy note dated February 2016 cited by Plaintiff does not indicate that she was habitually kicked out of stores at a frequency that would preclude even occasional social contact in the workplace. Rather, the cited record reflects Plaintiff's account of a grocery store incident in which she raised her voice and threatened physical harm to someone who offended her. The record does not state that Plaintiff was "kicked out," but does state that after she left, Plaintiff felt badly and called the manager to apologize, which the therapist noted "is progress for her." (Tr. 1370). And, while other notes reference difficulties during shopping, therapy notes suggest she improved with treatment. Contrary to Plaintiff's implicit suggestion that she was incapable of going to stores without being "kicked out," another therapy note dated April 2013 reflects that Plaintiff had three employment interviews at Kroger, Target and Walmart. Although she was not hired, she was not discouraged. (Tr. 709; *see also* Tr. 979, March 2014 therapy note reporting going to Walmart with no altercations). Her therapist recommended that she go shopping at Walmart to "practice" interacting with people. (Tr. 701). In June 2014, she told her therapist that she would have been "proud" when during a recent conflict with a salesperson, she was able to keep her composure. (Tr. 970).

Aside from records that reflect Plaintiff's social abilities to engage with family members, at least one "best friend," to go shopping, to go on job interviews, and to work out at the Y, The ALJ further explained that he relied on records that reflected Plaintiff's prior work history

> in retail, food service, and transportation. She said she got these jobs by networking with friends (i.e. socializing). The claimant was able to learn to do "semi-skilled" work for several months a "Cook" at White Castle. She was able to earn significant income. The claimant said she was fired after

13

having an argument with her supervisor. Afterwards, the claimant was able to find another job. She was able to learn "skilled" work and interact with others as a "Bus Dispatcher." From a social standpoint, the claimant was not too angry, confused, or overwhelmed by stress to be able to supervise children as a "School Bus Monitor." She said she was fired after driving a bus and running into another bus while moving them around the bus lot for cleaning in July 2009…. The claimant said she was not allowed to return to work due to her being a "hazard" due to her knee problems….

(Tr. 24). Plaintiff reported to Dr. O'Connell that she had worked for approximately five years as a bus monitor before being terminated. (Tr. 922).

> [D]espite her alleged limitations, the claimant was able to engage in relationships as an adult. Although she was not married, the claimant had two children and was reportedly a good mother. She had close relationships with her family and friends. …
>
> …The evidence showed the claimant was able to control her anger and moods well enough to keep custody of her own children and monitor children on a school bus until 2009.… She apparently felt mentally competent to work as she applied for jobs at Kroger, Target and Walmart in April 2013. The claimant was not too anxious or depressed to go out to dinners with family members.
>
> The claimant faced legal charges connected to her anger in November 2013…. However, despite her anger issues, the claimant's social function appeared to be adequate. The charges were reportedly dismissed. There was evidence one of the claimant's daughters was pregnant around this time…. The claimant as able to accompany her daughter to medical appointments. The claimant was also social[ly] adept enough to have a boyfriend.

(Tr. 25). The ALJ also noted that Plaintiff "had no difficulty interacting with me during the hearing." (Tr. 26). Plaintiff points to Dr. O'Connell's statement that she interacted in an odd interpersonal manner and was easily distracted and preoccupied. However, the full statement in Dr. O'Connell's report states that Plaintiff "maintained very limited eye contact *and interacted appropriately with this examiner*, but in an odd interpersonal style." (Tr. 924, emphasis added; *see also* Tr. 926, "The claimant demonstrated an odd interpersonal style, but nonetheless, interacted appropriately with this examiner"). Drs. Waggoner and Zuene both reviewed the full medical record, including Dr. O'Connell's

14

report, in April and July 2014, respectively, and opined that Plaintiff would be capable of occasional interaction with others. (Tr. 113, 126, 142, 157). Viewing the record as a whole, the undersigned finds substantial evidence to support the ALJ's finding that Plaintiff's limitations did not preclude her from "occasional" interactions with coworkers.

### b. Moderate Limitations in Concentration, Persistence or Pace

Without distinguishing between Steps 3, 4 and 5 off the sequential analysis, Plaintiff further argues that the ALJ erred in finding only moderate difficulties in concentration, persistence or pace "when the record clearly supports more restrictive limitations." (Doc. 12 at 11, citing Tr. 22). With respect to the ALJ's Step 3 analysis of the Paragraph B area, Plaintiff cites to no opinions or other evidence that would support "marked restriction" sufficient to satisfy any Listing.[2]

Moving on to Steps 4 and 5 of the sequential analysis, Plaintiff disagrees with the ALJ's assessment that she can sustain focus and concentration well enough to permit timely and appropriate completion of tasks such as supervising young children, managing resources, knowing what time her children's school bus was coming and walking them to the bus stop. (Tr. 22). Plaintiff points out that her children are <u>now</u> 19 and 17 years old, and that Plaintiff testified that they perform chores and care for her, rather than the other way around. However, Plaintiff alleges that she became disabled when her daughters were 10 and 12 years old. At the time she applied for benefits, she stated that she woke her kids up, cleaned and fed them, providing their sole care as a single mother. (Tr. 282).

Plaintiff argues that her reported hallucinations "would clearly interfere with an individual's ability to maintain attention, concentration, persistence and pace in <u>any</u> job,

---

[2] As with the assessment of Plaintiff's social functioning, Dr. O'Connell did not suggest that Plaintiff had "marked" restriction in concentration, persistence or pace.

including unskilled work." (Doc. 17 at 2, emphasis original). Again, however, Plaintiff's own records refute that argument. Despite reportedly suffering from the same hallucinations since early childhood, her work history includes both semi-skilled and skilled work.

Plaintiff argues that her severe symptoms interfere with her abilities to focus on the simplest of tasks, citing Dr. O'Connell's report. (Doc. 12 at 11, citing Tr. 923, 926). However, Dr. O'Connell did not offer any specific opinions that would support greater mental RFC limitations than determined by the ALJ at Steps 4 or 5 of the sequential analysis. In determining Plaintiff's mental RFC, the ALJ properly relied upon the medical opinions of Drs. Waggoner and Zuene, both of whom found that Plaintiff had only moderate limitations in concentration, persistence, or pace. (Tr. 111, 124, 140, 155).

Plaintiff further points to a statement by a new therapist, dated January 2015, that Plaintiff's outbursts would likely make it difficult for others to focus on their tasks, and difficult for Plaintiff to interact with the public. (Tr. 996). She argues that her ability to interact successfully with family members and/or friends "does not equate to an ability to interact successfully with others in a work environment, especially on a regular and continuing basis." (Doc. 12 at 12). Again, as reflected in the above discussion, the ALJ did not rely solely on Plaintiff's ability to get along with close family members.

The ALJ's mental RFC assessment limited Plaintiff to "simple, routine, repetitive tasks; no production quota work; occasional changes in the work setting; and occasional interaction with the public, coworkers, and supervisors." (Tr. 23). Despite her citation to select therapy notes to argue that her anger issues and other symptoms would require greater limitations, such as "no contact with coworkers" or work-preclusive limitations in concentration, persistence or pace, the undersigned finds substantial evidence to support

the mental RFC as determined.  Contrary to Plaintiff's reliance on Dr. O'Connell's report, that consultant offered no opinions that indicated greater functional limitation, even if the ALJ had not discounted the report as entitled to "little weight." Other consulting psychologists reviewed Dr. O'Connell's report and provided opinions that are consistent with the ALJ's mental RFC determination.

An ALJ is not required to include restrictions in the RFC that the ALJ did not accept. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  No consultant or other source assessed Plaintiff with more than moderate levels of impairment, opined she was required to have "no contact" with coworkers, or opined that her concentration, persistence or pace were so severely impaired as to preclude all employment.  Plaintiff fails to explain why her treatment notes would preclude the highly restricted range of work that the ALJ assessed.[3]

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

 /s Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

---

[3]Plaintiff also asserts that she would be off task more than 10% of the time but fails to cite to any medical opinion evidence that would support such a limitation.  Plaintiff's focusing issues are already accommodated by the RFC as determined.

17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| VICTORIA L. LANG, | Case No. 1:17-cv-503 |
| Plaintiff, | Barrett, J.<br>Bowman, M.J. |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).